J-S68004-19

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| | : | |
| MICHAEL J. DUNCAN | : | |
| | : | |
| Appellant | : | No. 1751 WDA 2018 |

Appeal from the PCRA Order Entered November 29, 2018
In the Court of Common Pleas of Washington County Criminal Division at
No(s): CP-63-CR-0000357-2011

BEFORE: GANTMAN, P.J.E., LAZARUS, J., and PELLEGRINI, J.[*]

MEMORANDUM BY PELLEGRINI, J.:              **FILED JANUARY 27, 2020**

Michael J. Duncan (Duncan) appeals from the order entered in the Court of Common Pleas of Washington County (PCRA court) dismissing his petition filed pursuant to the Post Conviction Relief Act (PCRA), 42 Pa.C.S. §§ 9541-9546. We reverse the PCRA court's order and remand for a new trial.

**I.**

This case stems from Duncan's conviction of first-degree murder and criminal conspiracy to commit murder[1] for the shooting death of John Lynn Newman (Newman). Newman had been acting as a confidential informant (CI) for the Pennsylvania State Police (PSP) in a drug-related investigation

_____

[*] Retired Senior Judge assigned to the Superior Court.

[1] 18 Pa.C.S. §§ 2502(a) and 903.

purchasing oxycodone from John Ira Bronson, Jr. (Bronson). In January 2012, a jury found that Newman's death was the result of a conspiracy between Duncan and co-defendant Bronson. On March 2, 2012, the trial court sentenced Duncan to life imprisonment for first-degree murder, plus a consecutive term of not less than fifteen nor more than thirty years' incarceration for conspiracy. In his direct appeal, a panel of this Court found all of Duncan's issues waived and affirmed the judgment of sentence. Duncan then successfully sought reinstatement of his direct appeal rights under the PCRA and filed an appeal *nunc pro tunc*. A panel of this Court affirmed the judgment of sentence on July 7, 2016, and our Supreme Court denied his petition for allowance of appeal.

Duncan, acting *pro se*, filed the instant PCRA petition on January 31, 2017, and appointed counsel filed an amended petition alleging ineffective assistance of trial counsel.[2] The PCRA court entered its order dismissing the petition on November 29, 2018, after issuing notice of its intent to do so. **See** Pa.R.Crim.P. 907(1). This timely appeal followed.

_____

[2] We note that trial counsel died in 2014. (**See** Trial Court Opinion, 12/13/18, at 12 n.2).

**II.**

On appeal, Duncan raises multiple claims of ineffective assistance of trial counsel. *See* 42 Pa.C.S. § 9543(a)(2)(ii); (Duncan's Brief, at 4, 12-25).[3] "The law presumes counsel has rendered effective assistance." *Postie*, *supra* at 1022 (citation omitted). "In general, to prevail on a claim of ineffective assistance of counsel, a petitioner must show, by a preponderance of the evidence, ineffective assistance of counsel which, in the circumstances of the particular case, so undermined the truth-determining process that no reliable adjudication of guilt or innocence could have taken place." *Id.* (citation omitted). "The petitioner must demonstrate: (1) the underlying claim has arguable merit; (2) counsel lacked a reasonable strategic basis for his action or inaction; and (3) but for the errors and omissions of counsel, there is a reasonable probability that the outcome of the proceedings would have been different." *Id.* (citation omitted). "The petitioner bears the burden of proving all three prongs of the test." *Id.* (citation omitted).

"A claim has arguable merit where the factual averments, if accurate, could establish cause for relief." *Id.* at 1023 (citation omitted). "[T]he

_____

[3] "Our standard of review of the denial of a PCRA petition is limited to examining whether the record evidence supports the court's determination and whether the court's decision is free of legal error. This Court grants great deference to the findings of the PCRA court if the record contains any support for those findings." *Commonwealth v. Postie*, 200 A.3d 1015, 1022 (Pa. Super. 2018) (*en banc*) (citations omitted).

ultimate question of whether facts rise to the level of arguable merit is a legal determination." **Id.** (citation omitted). Additionally, "[w]here matters of strategy and tactics are concerned, counsel's assistance is deemed constitutionally effective if he chose a particular course that had some reasonable basis designed to effectuate his client's interests." **Commonwealth v. Adams-Smith**, 209 A.3d 1011, 1019–20 (Pa. Super. 2019) (citation omitted). "A claim of ineffectiveness generally cannot succeed through comparing, in hindsight, the trial strategy employed with alternatives not pursued." **Id.** (citation omitted).

### A.

Duncan first claims that trial counsel was ineffective for failing to properly argue to the court that his testimony regarding an alibi defense was admissible. (**See** Duncan's Brief, at 12, 15-18). Duncan asserts that before trial, he informed defense counsel that he had an alibi for the night in question, specifically, that he was at a gentleman's club through the evening and early morning of the date of Newman's death. (**See id.** at 9).

We begin by noting that Pennsylvania Rule of Criminal Procedure 567[4] governs the defense of alibi and requires that notice of such a defense shall

---

[4] Pa.R.Crim.P. 567(A)(1)-(2), (B)(1) provides, in relevant part:

> (A) Notice by Defendant. A defendant who intends to offer the defense of alibi at trial shall file with the clerk of courts not later than the time required for filing the omnibus pretrial motion

be filed at the time of the omnibus pretrial motion. As this Court explained on direct appeal:[5]

> Appellant testified at trial in his own defense. Defense counsel asked Appellant where he was on the night Victim was killed. Appellant said he went to a strip club. When defense counsel asked Appellant what time he went there, the Commonwealth objected and the following exchange occurred at sidebar:
>
> [COMMONWEALTH]: We had no notice of alibi in this case. The date of death has been in discovery and known since 2003. We cannot get into this. It's improper. It's impermissible, frankly. We can't do it.

---

> provided in Rule 579 a notice specifying an intention to offer an alibi defense, and shall serve a copy of the notice and a certificate of service on the attorney for the Commonwealth.
>
> (1) The notice and a certificate of service shall be signed by the attorney for the defendant, or the defendant if unrepresented.
>
> (2) The notice shall contain specific information as to the place or places where the defendant claims to have been at the time of the alleged offense and the names and addresses of the witnesses whom the defendant intends to call in support of the claim.
>
> (B) Failure to File Notice.
>
> (2) If the defendant fails to file and serve the notice of alibi as required by this rule, the court may exclude entirely any evidence offered by the defendant for the purpose of proving the defense, **except testimony by the defendant**, may grant a continuance to enable the Commonwealth to investigate such evidence, or may make such other order as the interests of justice require.

(emphasis added).

[5] On direct appeal, Duncan raised the issue of his alibi testimony in the context of trial court error regarding admission of evidence.

[DEFENSE COUNSEL]: Just to talk about whether he was [at the strip club] that evening is not impermissible.

THE COURT: You already said that he was at some strip club. I still don't know the name of it.

[DEFENSE COUNSEL]: Filly Corral.

THE COURT: Where is that?

[COMMONWEALTH]: It's in New Stanton.

THE COURT: I don't know. I never heard of that. You can't go any further on that subject.

[DEFENSE COUNSEL]: We will move ahead.

THE COURT: You can't go any further without notice.

[DEFENSE COUNSEL]: We will move ahead.

(N.T. Trial, 1/23/12, at 184[7]-4[9]). Shortly thereafter, defense counsel again elicited testimony from Appellant regarding his whereabouts on the night of the homicide. Appellant testified that he went to Gerald Hull's house "between 3:00 [a.m.] and 4:00 [a.m.] or 4:30 [a.m.]" *Id.* at 185[3]. Appellant further stated: "I had stopped at Denny's to get something to eat after I left the strip club, Denny's in Belle Vernon. I left the strip [club] around 2:00, 2:30 in the morning, so it had to be around 4:00 [a.m.]" *Id.* The Commonwealth again objected. . . .

[COMMONWEALTH]: My objection still stands.

[DEFENSE COUNSEL]: I understand what [the Commonwealth] is saying.

[COMMONWEALTH]: You just gave [Appellant] an alibi for the entire—

[DEFENSE COUNSEL]: Who should I respond to first?

THE COURT: And then where after Denny's?

[COMMONWEALTH]: Gerald Hull's.

- 6 -

THE COURT: I took it to mean that the Commonwealth was complaining, as they did earlier object, that you were trying to get in an alibi defense.

[COMMONWEALTH]: We are.

[DEFENSE COUNSEL]: It's not—it's a time.

[COMMONWEALTH]: [Defense counsel], you have just alibied him out for the time of the homicide.

[DEFENSE COUNSEL]: Absolutely not.

[COMMONWEALTH]: Are you kidding me?  Are you kidding me?

THE COURT: You are trying to get an alibi defense in through the back door without a notice.

[DEFENSE COUNSEL]: We did not.  I'm asking—the question was did he go to Gerald Hull's house that evening.

THE COURT: He should have just answered yes.

[DEFENSE COUNSEL]: He answered what he answered.

THE COURT: What he answered provided an alibi for certain times that are important as to—

[DEFENSE COUNSEL]: I understand what you are saying.  We will move ahead.

THE COURT: And you didn't put on a notice of an alibi.

[DEFENSE COUNSEL]: Absolutely right.  Absolutely right.

THE COURT: Had you done so, you would have been permitted to present this testimony, but [the] Commonwealth would have had notice and they could have done interviews and investigations.

[COMMONWEALTH]: Just moving ahead is not good enough.  The Commonwealth believes that a cautionary instruction should be given.

THE COURT: What cautionary instruction are you requesting?

[COMMONWEALTH]: [Appellant's] testimony should be stricken and not considered.

THE COURT: I'm not going to repeat that testimony because we have all heard it differently.

[DEFENSE COUNSEL]: If the [c]ourt feels it's sustainable, I have no problem with you sustaining the objection.

THE COURT: I sustained it. But they are going one step beyond that. They want a cautionary instruction.

[DEFENSE COUNSEL]: It can be stricken.

THE COURT: That's part of a cautionary instruction. [Appellant's] response or answer to the last question regarding his whereabouts on—

[DEFENSE COUNSEL]: At 4:30.

[COMMONWEALTH]: February 3rd into February 4th.

[DEFENSE COUNSEL]: **I think the theory is [the homicide] happened at 9:00 or 9:30. This is hours, hours, hours and they can cross-examine on him.**

THE COURT: I don't know what time he went to the strip joint, whatever you call these places.

[DEFENSE COUNSEL]: This answer is absolutely part of their theory in their case. It's seven, eight hours.

THE COURT: You haven't laid that foundation, [defense counsel].

[COMMONWEALTH]: Let's be 100 percent up front. Your client just said that the prior evening, which stands to reason that means sometime before midnight.

[DEFENSE COUNSEL]: No, it doesn't.

[COMMONWEALTH]: He was at this strip club and went to Denny's and then to Gerald Hull's house. If you knew that's where he was, then you were required to file a notice of alibi. This date was a date certain from the very moment you took this case. And

furthermore, saying that we can cross-examine him on this is disingenuous because that then gets an alibi defense even more—

[DEFENSE COUNSEL]: I'm not trying to be disingenuous. I'm simply putting my response on the record. That's it. That's all I want to do. You make a ruling.

***Id.*** at 1852-54. The Commonwealth objected to Appellant's testimony on the ground that Appellant failed to file Rule 567 notice of an alibi defense. In response to the Commonwealth's objection, defense counsel did not claim Appellant's testimony was admissible under the Rule 567(B)(1) exception regarding a defendant's personal alibi testimony. Instead, defense counsel asserted the testimony was not alibi evidence *per se* because it did not necessarily cover the time of the homicide.

(***Commonwealth v. Duncan***, 2016 WL 5858270, at *6−7 (Pa. Super. Ct. filed July 7, 2016)). The trial court sustained the objection and issued a cautionary instruction to the jury that Duncan's response to the last question regarding his whereabouts was stricken from the record and should not be considered during jury deliberations. (***See*** N.T. Trial, 1/23/12, at 1859-60).

On direct appeal, we found the issue to be waived because the Commonwealth objected to Duncan's testimony on the ground that he failed to file Rule 567 notice of an alibi defense. In response to the Commonwealth's objection, defense counsel did not claim Duncan's testimony was admissible under the Rule 567(B)(1) exception regarding a defendant's personal alibi testimony, but instead asserted the testimony was not alibi evidence *per se* because it did not necessarily cover the time of the homicide. We held that because, in his direct appeal, Duncan characterized the testimony as alibi evidence to take advantage of the Rule 567 exception and at trial failed to

- 9 -

raise the admissibility of his testimony under that exception, he waived that issue.

After review, we agree with the PCRA court's conclusion that Duncan failed to demonstrate that counsel's handling of this matter lacked a reasonable strategic basis. While he did not contend that the testimony was admissible under the Rule 567(B)(1) exception, the record indicates that trial counsel, who was deceased at the time of the hearing, did not believe that Duncan's testimony covered the entire time-period at issue, especially between 9:00 p.m. and 9:30 pm. Because the record indicates that counsel chose a particular course that had some reasonable basis designed to effectuate Duncan's interests, we cannot conclude that counsel was ineffective with regard to arguing for admission of the purported alibi testimony.

**B.**

Duncan next contends that trial counsel was ineffective for failing to raise a **Brady**[6] claim when the PSP destroyed Newman's CI file. (**See**

---

[6] **Brady v. Maryland**, 373 U.S. 83 (1963). "Under **Brady**[ ] and subsequent decisional law, a prosecutor has an obligation to disclose all exculpatory information material to the guilt or punishment of an accused, including evidence of an impeachment nature." **Commonwealth v. Miller**, 212 A.3d 1114, 1124 (Pa. Super. 2019) (citation omitted). "To establish a **Brady** violation, an appellant must prove three elements: (1) the evidence at issue is favorable to the accused, either because it is exculpatory or because it impeaches; (2) the evidence was suppressed by the prosecution, either willfully or inadvertently; and (3) prejudice ensued." **Id.** (citation omitted). A failure to preserve potentially useful evidence does not constitute a denial of due process of law unless a defendant can show bad faith on the part the

Duncan's Brief, at 12-13, 18-20). Duncan asserts that authorities acted in bad faith in destroying the file and deprived him of the opportunity to prepare a full and fair defense.

The PCRA court concluded that Duncan's underlying **Brady** claim lacked arguable merit and had already been addressed on direct appeal. (**See** Trial Ct. Op., at 13). Although this Court on direct appeal found that Duncan waived his **Brady** claim, it further concluded that the issue lacked merit where:

> The [t]rial [c]ourt found by its December 27, 2011 Order that "the Commonwealth indicated that the [PSP], following standard state police practice regarding a person's confidential informant file, purged [Victim's] confidential informant file in 2009 (following a five (5) years requirement to maintain this type of file) [.]" As the PSP destroyed this file two years prior to the filing of charges in this case and pursuant to a standard document retention policy, the [c]ourt cannot characterize the Commonwealth's failure to preserve the evidence as being done in bad faith. (Trial Court Opinion, filed June 6, 2013, at 30). Consequently, even if Appellant had preserved the issue, we would accept the trial court's bad faith analysis and conclude Appellant's due process challenge merits no relief.

(**Duncan**, **supra** at *9).

Because the underlying **Brady** claims lacks merit, we conclude that Duncan's trial counsel was not ineffective for failing to raise it. **See Miller**, **supra** at 1129 ("Counsel will not be deemed ineffective for failing to raise a meritless claim.") (citation omitted).

---

police. **See Commonwealth v. Brown**, 200 A.3d 986, 994 (Pa. Super. 2018).

**C.**

Duncan also challenges the trial counsel's handling of an issue that arose with respect to Juror No. 3 and a lawyer who was not involved in this case, Attorney Sean Logue. (*See* Duncan's Brief, at 22-25). Specifically, when Juror No. 3 was returning to the courtroom after taking a cigarette break, Attorney Logue approached him and asked if he was a juror and whether he was on the murder trial. Juror No. 3 told Attorney Logue that he could not talk about it, walked away and immediately reported the incident to court staff. Both the juror and Attorney Logue were involved in conservative politics, and there was a suggestion that the juror may have been involved in the district attorney's campaign. (*See* N.T. Trial, 1/18/12, at 979, 997, 1004). On appeal, Duncan argues that counsel was ineffective for failing to insist that the court question Juror No. 3 about his interaction with Attorney Logue and whether it impacted his ability to serve. (*See* Duncan's Brief, at 24-25).

A review of the record belies Duncan's claim. The notes of testimony show that defense counsel **did** request that Juror No. 3 be excused or that the court individually *voir dire* him. (*See* N.T. Trial, 1/18/12, at 980, 996-97, 1004-05). The Commonwealth objected, noting that Juror No. 3 had already been extensively *voir dired* both written and orally in the presence of counsel and the court. (*See id.* at 981). The court denied the defense motion and advised Juror No. 3 that he acted appropriately in reporting the incident to court staff immediately. (*See id.* at 1005-06). Thus, because defense

counsel did request *voir dire*, Duncan's claim that he failed to do so lacks arguable merit.

**D.**

Duncan next argues that trial counsel failed to adequately challenge the credibility of Commonwealth witness Michael Bowman (Bowman) because he failed to impeach his testimony based on his receiving immunity for his testimony. (***See*** Duncan's Brief, at 20-22).

All of the other testimony was based on Duncan's admissions that he had killed Newman and there was no physical evidence linking him to the crime. Bowman, the only person who had first-hand knowledge of the events leading up to the murder, made him a key witness. In exchange for immunity, Bowman testified that he was at a meeting where Duncan and Bronson formulated a plan to kill Newman because Newman owed Bronson money and was a "snitch." He testified that he was asked to participate in that meeting but declined. Bowman also testified that in April 2003, while on furlough, Bowman spoke with Duncan who told Bowman that he killed Newman and explained the manner in which he did it. Duncan told Bowman that he was in the rear of Newman's car and shot him in the left ear. Between April and June 2003, Bowman had a three-way call with a woman and Duncan. Again, Duncan admitted that he killed Newman. ***See Commonwealth v. Duncan***, No. 237 WDA 2015, 2016 WL 5858270, at *1 (Pa. Super. Ct. filed July 7, 2016).

When Duncan contends that his counsel knew or should have known that Bowman received immunity to testify in this trial, he contends that failure to question Bowman regarding his receiving immunity would have seriously damaged his credibility. In rejecting that argument, the PCRA court found that counsel was not ineffective because counsel for both defendants questioned Bowman extensively and aggressively on cross-examination and re-cross- examination regarding his truthfulness and potential bias. (*See* N.T. Trial, 1/18/12, at 1039-1127). As the PCRA court points out, counsel for Duncan began his cross-examination of Bowman by stating "let's start with your criminal record[,]" and went on to outline his convictions for receiving stolen property, drug violations, armed robbery, terroristic threats and false reports to police officers. (*Id.* at 1069; *see id.* at 1069-72, 1089). Counsel questioned Bowman regarding his lenient guilty plea in a separate armed robbery case in an attempt to establish a motive for his testimony. (*See id.* at 1089-96).

The PCRA court found that in light of counsel's thorough cross-examination of Bowman in front of the jury regarding his prior convictions and pleas involving false reports to police and armed robbery, counsel effectively challenged Bowman's credibility. However, that is an assumption because we do not know that counsel effectively challenged his credibility. Duncan was convicted and, in any sufficiency of the evidence claim, we would be required

to assume that the jury found his testimony credible, and any fact that he testified to could be used to support the verdict.

The importance of the grant of immunity or promises of immunity in impugning the credibility of a government witness was explained by our Supreme Court in **Commonwealth. v. Strong**, 761 A.2d 1167, 1171 (Pa. 2000), stating:

> Exculpatory evidence favorable to the accused is not confined to evidence that reflects upon the culpability of the defendant. Exculpatory evidence also includes evidence of an impeachment nature that is material to the case against the accused. **Napue v. Illinois**, 360 U.S. 264, 269, 79 S.Ct. 1173, 3 L.Ed.2d 1217 (1959). As the court in **Napue** sagely observed: "**[t]he jury's estimate of the truthfulness and reliability of a given witness may well be determinative of guilt or innocence, and it is upon such subtle factors as the possible interest of the witness in testifying that a defendant's life or liberty may depend.**" **Id.** at 269, 79 S.Ct. 1173. Any implication, promise or understanding that the government would extend leniency in exchange for a witness' testimony is relevant to the witness' credibility. **United States v. Giglio**, 405 U.S. 150, 154, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972). (Emphasis added.)

It went on to state that:

> Given that [witness] is the key witness who puts the gun in appellant's hand at the moment of the murder, his credibility was decisive to the jury's finding as to appellant's guilt. Impeachment evidence which goes to the credibility of a primary witness against the accused is critical evidence and it is material to the case whether that evidence is merely a promise or an understanding between the prosecution and the witness.
>
> *     *     *
>
> The facts in this case strongly indicate that [witness's] testimony was in exchange for what he believed would be a beneficial outcome to him. **That understanding was material information that appellant's jury should have been**

**informed of when weighing Alexander's credibility**. There is a reasonable probability that had this information been revealed, the outcome of appellant's trial would have been different. *Bagley, supra., Agurs, supra., Giglio, supra., Brady, supra*.

In this case, Bowman was a key witness because he was the only witness to describe the details of the meetings and the only direct evidence to point to a conspiracy. He testified at trial that he was present when Bronson arranged for Duncan to kill Newman and further testified that Duncan told him he then killed Newman. Disclosure of the immunity agreement was material information that Duncan's jury should have been informed of when weighing Bowman's credibility and the motivation for his testimony. While the jury heard that he had been convicted previously and received what was purportedly a lenient sentence in an armed robbery conviction, those reasons could be used in any case at any time to challenge his credibility. However, his receiving of immunity to testify went directly to why he was testifying in this case and was important for a jury to know in determining Bowman's credibility.

There was also no strategic reason for defense counsel not to bring out on cross that Bowman was only willing to testify if he received immunity; rather, such questioning would fit squarely within defense counsel's strategy.[7]

_____

[7] There can be valid strategic reasons for not bringing up the immunity defense. **See Commonwealth v. Baxter**, No. 1277 EDA 2015, 2016 WL 6803858, at *14–15 (Pa. Super. Ct. Nov. 17, 2016); **Commonwealth v.**

When this issue was raised in the direct appeal, it was raised as a **Brady** violation because it had not been turned over in discovery – in effect, that defense counsel was unaware of its existence. We found that trial counsel should have known of the immunity agreement because it was in the grand jury transcript. We stated:

> Prosecution offered Michael Bowman immunity in exchange for his testimony at Appellant's trial; **disclosure of immunity agreement to jury would have been favorable to Appellant**; nevertheless, there is no indication Commonwealth suppressed or withheld evidence of agreement; existence of agreement was apparent on face of grand jury transcript; defense counsel received copy of grand jury transcript before trial and repeatedly referred to it during cross-examination of Mr. Bowman; therefore, Appellant had equal access to allegedly withheld information and no **Brady** violation occurred. (Emphasis added).

**Commonwealth v. Duncan**, at *10.

Had defense counsel read the grand jury transcript and cross-examined Bowman on immunity, the fact that Bowman received immunity could have tipped the jury to find all of his testimony not credible, weakening the Commonwealth's theory of conspiracy and revenge and making it more likely to acquit him on those charges. Accordingly, because Bowman was a key witness, we conclude that there is a reasonable probability that this information would have changed the outcome of Duncan's trial and his claim of ineffectiveness is justified.

---

**McBride**, No. 2187 EDA 2015, 2017 WL 362616, at *6 (Pa. Super. Ct. Jan. 25, 2017).

Order reversed.  Remand for new trial.  Jurisdiction relinquished.

Judge Lazarus joins the memorandum.

President Judge Emeritus Gantman concurs in the result.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 1/27/2020